IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PERNELL HAMMOND                           :
                                          :
      v.                                  :
                                          :   Civil Action No. CCB-09-0746
TANEYTOWN VOLUNTEER                       :
FIRE COMPANY                              :
                                          :

...o0o...

**MEMORANDUM**

Now pending before the court is defendant's motion to dismiss. Plaintiff Pernell Hammond ("Hammond") has sued the Taneytown Volunteer Fire Company ("Fire Company") for violation of Md. Code Ann., Crim. Law § 10-304, negligent supervision, gross negligence, and violation of 42 U.S.C. § 1981 through a hostile work environment, disparate treatment on the basis of race, and retaliation. The issues in this case have been fully briefed and no hearing is necessary. For the reasons stated below, the defendant's motion to dismiss will be granted in part and denied in part.

**BACKGROUND**

As this is a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the following facts are presented in the light most favorable to the plaintiff. The Fire Company hired Hammond, an African-American male, as a volunteer firefighter and an emergency medical technician in March 2006. Throughout his tenure, Hammond was the only African-American person working for the Fire Company. Soon after joining the Fire Company, Hammond discovered a co-worker downloading songs with racist titles and lyrics on to a company computer. After Hammond

asked that the songs be deleted, his fellow firefighters began to ridicule him for this request and, more generally, for being African-American.

Fire Company volunteers frequently used the word "nigger" and berated African-American people in front of Hammond. Lieutenant Ricky Krebs ("Lt. Krebs"), Hammond's supervisor, also used the word "nigger" around Hammond, laughed at racist jokes, and encouraged other firefighters to make racist remarks. On one occasion in June 2006, Lt. Krebs, during a conversation with Hammond, pretended to be a police officer and pushed another firefighter against a fire engine while shouting, "Up against the car, nigger!" (Pl.'s Compl. at ¶ 8.) When Hammond subsequently asked Lt. Krebs to stop using the word "nigger" at work, Lt. Krebs told Hammond to "deal with it." (*Id.*) Later that same day, Lt. Krebs teased Hammond about the fact that a local bar was full of "his people." (*Id.*)

Also in June 2006, several firefighters began referring to Hammond exclusively as "DAN," which Hammond did not understand the meaning of initially, but assumed to be a friendly gesture. (*Id.* at ¶ 10.) In July, however, Hammond was humiliated to learn that "DAN" stood for "dumb ass nigger." (*Id.*) Two co-workers, Frank Penn, III and Lieutenant David Newman, later mocked Hammond for being "too stupid to know what 'DAN' mean[t]." (*Id.*)

This harassing conduct led Hammond to submit a letter of resignation to the Fire Company on July 4, 2006. In response, on July 7, 2006, the President and Vice President of the Fire Company asked Hammond to revoke his letter of resignation, assuring him that they would discipline the employees responsible for the harassment. Hammond revoked his resignation, but the harassment continued without any disciplinary action from the Fire Company.[1] Later that

---

[1] According to the defendant, Hammond initially refused to provide the names of those he believed had engaged in discriminatory conduct.

month, Hammond's fellow firefighters intentionally left him behind as they drove away on a fire truck to answer a call, further humiliating Hammond.

Hammond then conducted an interview with the Carroll County Times about the discriminatory harassment at the Fire Company. In response to this publicity, Hammond received threatening phone calls that made him fear for his safety should he continue to work at the Fire Company. Soon after, Hammond discovered that someone had slashed his car tires, which Hammond perceived as a response to his complaints of discrimination at the Fire Company and because of his race.[2] Because of the harassment and threats, Hammond felt that he could no longer remain at the Fire Company and resigned, subsequently moving to a different town for his safety. Hammond filed a complaint in this court on March 26, 2009, seeking monetary relief and an injunction requiring the Fire Company to adopt policies and procedures to protect African-American employees from racial harassment. On April 27, 2009, the Fire Company filed a motion to dismiss.

## ANALYSIS

"[T]he purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (internal quotations and alterations omitted). When ruling on such a motion, the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most

---

[2] The identity of the individual or individuals who made these threatening phone calls and slashed Hammond's tires is unknown, but Hammond appears to assume that co-workers were responsible. (*See* Pl.'s Compl. at ¶ 17 (discussing the "threats made by fellow employees").)

favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir.1997). To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). Thus the plaintiff's obligation is to set forth sufficiently the "grounds of his entitlement to relief," offering more than "labels and conclusions." *Id.* (internal quotation and alterations omitted); *see Young v. City of Mount Ranier*, 238 F.3d 567, 577 (4th Cir. 2001) ("the presence [in a complaint] . . . of a few conclusory legal terms does not insulate a complaint from dismissal under Rule 12(b)(6) when the facts alleged in the complaint cannot support" the necessary legal finding).

   A.  Md. Code Ann., Crim. Law § 10-304 Claim

Count I of the complaint alleges that the Fire Company violated Md. Code Ann., Crim. Law § 10-304, which prohibits hate crimes based on race. Although this criminal statute does not grant a civil cause of action, Hammond argues in the Opposition to Defendant's Motion to Dismiss that the Fire Company's violation of this statute constitutes wrongful discharge. (*See* Pl.'s Opp. at 3.)

"[T]o establish wrongful discharge, the employee must be discharged, the basis for the employee discharge must violate some clear mandate of public policy, and there must be a nexus between the employee's conduct and the employer's decision to fire the employee." *Wholey v. Sears Roebuck*, 803 A.2d 482, 489 (Md. 2002). Maryland courts have found a clear mandate of public policy to be violated only in very limited circumstances: (1) "where an employee has been fired for refusing to violate the law or the legal rights of a third party," and (2) "where an

employee has been terminated for exercising a specific legal right or duty." *King v. Marriott Int'l Inc.*, 866 A.2d 895, 901 (Md. App. 2005). Neither of these circumstances matches the situation at hand, in which employees of the Fire Company are alleged to have committed violations of Maryland's hate crimes statute.[3]

In addition, the claim of wrongful discharge is unavailable when the employee has an alternative statutory remedy. *See Makovi v. Sherwin-Williams Co.*, 561 A.2d 179, 190 (Md. 1989) (noting that "the generally accepted reason for recognizing the tort [of wrongful discharge], that of vindicating an otherwise civilly unremedied public policy violation, does not apply" when the discharge is motivated by employment discrimination prohibited by statutes such as Title VII which grant "both the right, by way of an exception to the terminable at-will doctrine, and remedies for enforcing that exception"). Therefore, the court will dismiss Count I of the complaint.

---

[3] Furthermore, Hammond does not claim to have reported these alleged violations of the hate crimes law to law enforcement officials or to have cooperated with any law enforcement investigation into the matter. Therefore, he could not have been discharged for exercising a legal right or duty. *See Wholey*, 803 A.2d at 495 (holding that "terminating employment on the grounds that the employee…*reported a suspected crime* to the appropriate law enforcement or judicial officer is wrongful and contrary to public policy") (emphasis in original); *Miller v. U.S. Foodservice, Inc.*, 405 F. Supp. 2d 607, 611-13 (D. Md. 2005) (finding that cooperating with law enforcement in an ongoing criminal investigation is protected activity for the purposes of a wrongful discharge claim).

*B. 42 U.S.C. § 1981 Claims*[4]

Counts II, III, and IV of the complaint allege that the Fire Company violated 42 U.S.C. § 1981 by creating a hostile work environment and disparately treating and retaliating against Hammond because of his race. I will address the hostile work environment claim first.

To succeed on a claim for a racially hostile work environment under Fourth Circuit law, the employee must show that the harassment was: 1) unwelcome, 2) based on race, 3) sufficiently severe or pervasive to alter the conditions of employment, and 4) there was some basis for imposing liability on the employer.[5] *See Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 183-84 (4th Cir. 2001). Although the first element is subjective, the other elements are objective, based on a "reasonable person" standard. *Pueschel v. Peters*, 577 F.3d 558, 565 (4th Cir. 2009). In determining whether conduct is sufficiently severe and pervasive, the courts look to the "totality of the circumstances," including 1) the frequency of the discriminatory conduct, 2) the severity of the conduct, 3) whether the conduct was physically threatening, humiliating, or a mere offensive utterance, and 4) whether it unreasonably interferes with an employee's work performance. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 787-88 (1998).

The racist epithets that Hammond's fellow volunteer firefighters used in his presence were clearly racially-motivated and unwelcome, as Hammond complained to Lt. Krebs and eventually resigned over them. The alleged conduct was also severe and pervasive enough to state a hostile work environment claim. The racist remarks were made frequently, with members

---

[4] The Fire Company briefly mentions in a footnote that "it is not at all certain that Plaintiff has a viable § 1981 claim" because Hammond was an unpaid volunteer, without any employment contract. (Mot. to Dismiss at 7 n.1.) As neither party has addressed this issue at any greater length, I will not consider it in deciding this motion to dismiss. The defendant may raise this again at the time it files a summary judgment motion, if appropriate.

[5] The elements for a claim of hostile work environment are the same under both § 1981 and Title VII. *See Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001).

of the Fire Company using the word "nigger" in Hammond's presence repeatedly and referring to him exclusively as a "dumb ass nigger," through the acronym "DAN," for over a month. As the Fourth Circuit explained in *Spriggs*:

> Far more than a "mere offensive utterance," the word "nigger" is pure anathema to African-Americans. Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as "nigger" by a supervisor in the presence of his subordinates.

242 F.3d at 185 (internal quotation omitted). Indeed, Hammond's supervisor, Lt. Krebs, is alleged to have used the word "nigger" frequently in front of his subordinate firefighters.

After Hammond complained about this conduct through his initial letter of resignation, the harassment turned even more severe. On one occasion, Hammond's fellow firefighters intentionally left him behind on a call. In addition, Hammond believes that co-workers were responsible for the threatening phone calls and slashing of his car tires that occurred after his interview with the newspaper. Based on these alleged facts, Hammond has stated a claim that the harassment he endured was sufficiently severe and pervasive to alter the conditions of his work with the Fire Company.

Finally, to state a hostile work environment claim under § 1981, Hammond must find a basis for imposing liability on the Fire Company. Workplace harassment falls into two categories when determining employer liability: (1) "harassment that culminates in a tangible employment action, for which employers are strictly liable," and (2) "harassment that takes place in the absence of a tangible employment action, to which employers may assert an affirmative defense." *Pa. State Police v. Suders*, 542 U.S. 129, 143 (2004) (internal quotations and citations omitted). When a hostile work environment claim alleges that the plaintiff was constructively discharged from employment, the employer will only be held strictly liable if the employee's

7

resignation was effected through an official company act, as opposed to co-worker or supervisory conduct. *See id.* at 148. If the harassment falls within the second category, however, the employer will escape liability "if it can demonstrate, by a preponderance of the evidence, that (1) it 'exercised reasonable care to prevent and correct promptly any harassing behavior'; and (2) the plaintiff 'unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" *Spriggs*, 242 F.3d at 186 (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher*, 524 U.S. at 807).

The court will assume that Hammond states a claim for constructive discharge based upon the same facts that constitute his hostile work environment claim. Whether the Fire Company can assert an affirmative defense cannot be determined at this stage of the litigation.[6] Accordingly, the Fire Company's motion to dismiss Count II will be denied.

Hammond's claims of disparate treatment and retaliation also may proceed at this point, as they will not significantly enlarge the scope of discovery given that their underlying facts largely overlap with those of the hostile work environment claim. The Fire Company's motion to dismiss Counts III and IV will therefore be denied.

C. *Negligent Supervision and Gross Negligence Claims*

Counts V and VI of the complaint raise claims of negligent supervision and gross negligence. In both claims, Hammond argues that the Fire Company violated its duty to protect him from the discriminatory conduct of his fellow employees. As the claims of negligent supervision and gross negligence are derived from the common law, however, they may only be

---

[6] Even if the Fire Company's disciplinary letters could be considered on this motion to dismiss, they were not sent until September 11, 2006, more than two months after Hammond initially submitted his letter of resignation and more than one month after Hammond finally resigned.

8

predicated on common law causes of action. *See Hart v. Harbor Court Assocs.*, 46 F. Supp. 2d 441, 444 (D. Md. 1999); *Demby v. Preston Trucking Co.*, 961 F. Supp. 873, 881-82 (D. Md. 1997). A cause of action under § 1981 does not arise under the common law and therefore will not support a claim of negligent supervision or gross negligence. Accordingly, the court will dismiss Counts V and VI of the complaint.

## **CONCLUSION**

For the foregoing reasons, the defendant's motion to dismiss will be granted in part and denied in part. A separate Order follows.

October  13, 2009                                             /s/
Date                                                        Catherine C. Blake
                                                            United States District Judge